# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| JEFFREY BOUDREAU, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF WENDY BOUDREAU, <br><br>        PLAINTIFF <br><br> v. <br><br> SHAW'S SUPERMARKETS, INC., <br><br>        DEFENDANT | CIVIL NO. 2:17-CV-259-DBH |

## DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SANCTIONS AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A violent grocery store murder in 2015 generated this civil lawsuit. Without provocation, one customer murdered another customer in the store's ice cream aisle on a summer afternoon. Later that year, the murderer was sentenced to life in prison.[1] In 2017, the personal representative of the victim's estate (her husband) brought this wrongful death lawsuit against the grocery store for negligence, arguing that the store should have foreseen the danger and taken preventive action.[2] The defendant moved for summary judgment, and the plaintiff opposed the motion and moved for sanctions because most of the store video for the days and weeks preceding the murder is missing. After oral

---

[1] See Maine Dep't of Corrections, Prisoner/Probationer Search, *available at* https://www1.maine.gov/cgi-bin/online/mdoc/search-and-deposit/detail.pl?mdoc_number1=153612 (last visited July 1, 2019). I take judicial notice of the sentence under Fed. R. Evid. 201(b)(2).

[2] Jurisdiction is based upon diversity of citizenship.

argument on June 6, 2019, I deny the motion for sanctions and grant the motion for summary judgment.

**BACKGROUND UNDISPUTED FACTS**

Shaw's operates a grocery store in Saco, Maine. The deceased victim, Wendy Boudreau, was a regular customer. So was the murderer, Connor MacCalister. On August 19, 2015, MacCalister brutally murdered Boudreau by slitting her throat with a knife in the store's ice cream aisle. MacCalister has said that she selected Boudreau partly because she was an older woman who would be less able to resist. Pl.'s Add'l Statement of Mat. Facts (PASMF) at ¶¶ 66-67 (ECF No. 84). Despite the efforts of store personnel and customers, including two EMTs shopping in the store at the time, Boudreau did not survive.

**MOTION FOR SANCTIONS FOR SPOLIATION**

During discovery, the plaintiff requested all the Saco store video showing MacCalister's appearance and behavior in Shaw's in the days and weeks preceding the murder. The store had 48 motion-activated video cameras that produced recordings that could be viewed contemporaneously or at a later date. McCourt Dep. 52-53 (ECF No. 56-10). If video from a particular day was not saved, that data was overridden as the hard drive became full. According to Senior Asset Protection Specialist Warren McCourt, that occurred about every 3-4 weeks, such that there were generally 3-4 weeks of data available at any given time. See McCourt Aff. II (ECF No. 96-3). In this case, however, Shaw's has provided video only for the day of the murder and for some of MacCalister's

transactions two days earlier,[3] but not for other days and weeks preceding the incident.  That missing video is the subject of the spoliation dispute.

Although earlier cases articulate a federal court's inherent authority to grant relief for spoliation of evidence, in 2015 the Federal Rules of Civil Procedure adopted a major amendment of the spoliation rules for electronically stored information.  Fed. R. Civ. P. 37(e) now occupies the field, to the exclusion of a federal court's inherent authority and, for the most part, state law:[4] "New Rule 37(e) . . . forecloses reliance on inherent authority or state law to determine when certain measures should be used."  Adv. Comm. Note to 2015 Amendment; Gonzalez-Bermudez v. Abbott Lab PR Inc., 214 F. Supp. 3d 130, 161 (D.P.R. 2016) (quoting the Advisory Committee Note).

Rule 37(e) now provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>     (1)  upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>     (2)  only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>         (A) presume that the lost information was unfavorable to the party;
>         (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>         (C) dismiss the action or enter a default judgment.

---

[3] At oral argument I learned that the earlier video was preserved because MacCalister had cash register receipts in her pocket when she was arrested showing transactions on that earlier day as well as the cash register line involved.

[4] Whether and when there is a duty to preserve remains a decision based on "a common-law duty" "when litigation is reasonably foreseeable," and the Rule "does not attempt to create a new duty to preserve."  Adv. Comm. Note to 2015 Amendment, Fed. R. Civ. P. 37(e).

According to Rule 34(a)(1)(A), "electronically stored information" includes "photographs [and] . . . images . . . stored in any medium from which information can be obtained either directly or, if necessary, after translation . . . into a reasonably usable form." The 2006 Advisory Committee Note to that Rule subsection says that the definition "is expansive and includes any type of information that is stored electronically," and that "[r]eferences elsewhere in the rules to 'electronically stored information' should be understood to invoke this expansive approach." Id. Thus, under the amended Rule, Shaw's store video is electronically stored information.

At oral argument, I asked the lawyers what I should treat as the record for purposes of resolving the spoliation motion. What follows reflects what they told me.

Immediately following the murder, Shaw's preserved for the police that day's video of the Saco store showing the victim and MacCalister (but not the actual murder because no camera covers the ice cream aisle, see McCourt Dep. 15:18-21), as well as MacCalister's transactions two days earlier. That video has been made available to the plaintiff. At the outset of the lawsuit and the beginning of discovery, both parties' lawyers believed there was no other video. As a result of the 2018 deposition of the store's Senior Asset Protection Specialist, however, the parties learned that on the day of the murder Shaw's not only transferred the day's relevant video onto a disk for the police, but also "physically removed the two hard drives and a black Intellex box on which the

video for the last 30 days or so was stored and set them aside in the server room[5] at the store." McCourt Aff. II ¶ 12. McCourt "taped a sign to the Intellex box, which stated 'DO NOT TOUCH THIS HARD DRIVE—YOU NEED TO CONTACT WARREN OR RICK[6] FIRST.'" Id. When asked after his 2018 deposition "to retrieve the three hard drives that were set aside," he reported that "two were nowhere to be found. Although we found the Intellex box, it only contained images from 2016 and none from 2015, when the murder occurred." Id. ¶ 13. The lawyers for both parties confirmed this information.[7] The record does not reveal how this state of affairs came to be, nor what happened to the hard drives that McCourt originally preserved. The plaintiff did not pursue further discovery on the topic of the missing video.[8]

At oral argument, I asked the plaintiff's lawyer what the plaintiff wanted by way of remedy if I found a Rule violation (her legal memorandum had made varying requests). The lawyer responded that because at summary judgment I must view the evidence in the light most favorable to the plaintiff, and because she had proffered direct witness testimony about how MacCalister behaved in the store, there was no need at summary judgment to compensate for any prejudice caused by the missing video. But at trial, where there will be cross-examination and presentation of conflicting evidence, she wants an instruction

---

[5] It was also referred to as the "tower net room." McCourt Dep. at 17:18 (ECF No. 56-10).

[6] Rick DesFosses was the District Loss Prevention/District Asset Protection Manager. See DesFosses Dep. at 3:23-4:25 (ECF No. 84-19).

[7] At oral argument I understood Shaw's lawyer to say that she and the plaintiff's lawyer were the ones who discovered that the preserved data covered 2016. See also Tr. of Hearing before Magistrate Judge Rich on Jan. 3, 2019, at 23 (ECF No. 108) (same). But it does not matter to my decision whether McCourt or the lawyers discovered that fact first.

[8] Further discovery was discussed at a conference with the Magistrate Judge on January 3, 2019. See Jan. 3, 2019 Tr., note 7, supra, at 34-37.

about "a permissive inference that essentially whatever's shown on that video may contradict what Shaw's is going to introduce as evidence, minimizing the fact that her behavior was anything that put them on notice. We would want the jury to infer that."

I now address the requirements of Rule 37(e).

**_Duty to Preserve._** At oral argument, Shaw's' lawyer argued that Shaw's had no duty to preserve _any_ video of events before the day of the murder because a civil lawsuit was not reasonably anticipated after the murder.[9] But in fact Shaw's _did_ initially preserve the video, and the record does not disclose when the relevant hard drive disappeared or was overwritten. For all I know, it could have occurred after the plaintiff filed this lawsuit. For purposes of the motion I assume that Shaw's had a common law duty to preserve the video at the undetermined time it was destroyed.[10]

Under Rule 37(e), if electronically stored information should have been preserved in anticipation of litigation, but was lost because of the failure to take reasonable steps to preserve it, and if it cannot be restored or replaced through additional discovery, the Rule specifies the available relief.

**_Failure to Take Reasonable Steps to Preserve._** Shaw's initially took reasonable steps to preserve the video when McCourt set aside the hard drives

---

[9] She referred to a meeting that took place soon after the murder (an EMT called it a "roundtable," Armand Beaulieu Dep. at 28 (ECF No. 56-6); see also Jerry Beaulieu Dep. at 26-28 (ECF No. 56-7)), where the victim's family and Shaw's representatives were present and the plaintiff apparently said that he didn't blame Shaw's. This lawsuit was not filed until July of 2017. (ECF No. 1). The plaintiff gave Shaw's notice of his claim in May of 2017. See Def.'s Objection to Pl.'s Am. Mot. Ex. 1 (ECF No. 97-1).

[10] The duty to preserve is determined by common law. See Adv. Comm. Note to 2015 Amendment, Fed. R. Civ. P. 37(e), note 4, supra.

in the tower net room with a sign not to touch them. Was their disappearance thereafter due to the failure to take reasonable steps to preserve them? I cannot answer that question on the record the parties presented, but for purposes of the motion I will assume the answer is yes, because the video was at all times under Shaw's' control.

***Restore or Replace through Additional Discovery.*** Can additional discovery restore or replace the missing video? No, there is no way to restore or replace the lost electronic data, *i.e.*, the video itself.

***Prejudice.*** Has the plaintiff been prejudiced by the loss of this information? The Advisory Committee Note specifies that the Rule does not determine whose burden it is to prove or disprove prejudice, but leaves that decision to the court's discretion. Even if I place the burden here on Shaw's, I am doubtful there is any prejudice to this plaintiff. Witnesses (staff and customers) can be and were deposed (here, over twenty, Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Opp'n) at 1 (ECF No. 85)) about what they observed of MacCalister in Shaw's before the murder. No limits were placed on such depositions. At most, the missing video might provide images of what certain customers say they observed about MacCalister at Shaw's before the day of the murder. At oral argument I asked the plaintiff's lawyer what her best-case scenario would be of what the missing video might reveal, and she said that she wished she could show the jury MacCalister's behavior at the checkout lines to rebut any argument Shaw's might make that MacCalister was "shy, quiet, childlike, innocent" rather than "a disturbance or harmful or scary." For summary judgment purposes, however, I will assume that MacCalister was in

the store virtually every day, and that she always dressed the same way and exhibited the same mien. I will also assume that she had encounters with customers as they describe the encounters. I believe that, under Rule 37(e)(1), that is a measure that cures any prejudice at summary judgment, and the plaintiff's lawyer agreed as much at oral argument.

**_Inference Instruction._** Below, I conclude that there will be no trial. But because the spoliation issue has been fully argued and because this District has not previously dealt with the amended Rule, I will complete the analysis. If the case were to go to trial, could the plaintiff obtain the extra curative relief he requests? Any inference—permissive or mandatory—that there is unfavorable information on the missing video is available "only upon finding that [Shaw's] acted with the intent to deprive [the plaintiff] of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).[11] The plaintiff's lawyer urged at oral argument that I should infer intent because someone ignored the sign that McCourt had placed on the hard drives in the net tower room, thereby making them unavailable. But what the Rule requires is "intent _to deprive another party of the information's use in the litigation_," which is not just intentional action but a specific kind of intent.[12] There has been no such showing here. For all this record shows, some employee might have needed the hard drives for another purpose and intentionally removed them, but with no intent to prevent this

---

[11] The intent requirement for such an instruction "is consistent with the underlying notion of the adverse inference—that it is reasonable to presume that the lost information was harmful to the party's failure to preserve because the failure to preserve implies that it was unfavorable." 8B Charles Alan Wright et al., Federal Practice & Procedure § 2284.2 (3d ed. 2019).

[12] See, e.g., Auer v. Minot, 896 F.3d 854, 858 (8th Cir. 2018) ("serious and specific sort of culpability"; "intentional, bad-faith misconduct").

plaintiff from using the video in this lawsuit. Unlike prejudice, the Advisory Committee Note does not discuss whose burden it is to prove or disprove this specific kind of intent. But the cases generally treat it as the moving party's burden. Postle v. Silkroad Tech., Inc., 2019 WL 692944, at **1, 7 (D.N.H. Feb. 19, 2019) (applying the clear and convincing evidence standard); Jones v. District of Columbia, 314 F. Supp.3d 36, 52 n.11 (D.D.C. 2018) (burden on the moving party); Alabama Aircraft Ind., Inc. v. Boeing Co., 319 F.R.D. 730, 744 (N.D. Ala. 2017) (finding intent as to some ESI, but not as to other ESI because "[a]lthough their loss is inexplicable, there is insufficient evidence for the court to conclude that there was any nefarious intent involved"); Marshall v. Dentfirst, P.C., 313 F.R.D. 691, 701 (N.D. Ga. 2016) (burden on the moving party). I recognize the downside in assigning the burden to the moving party, because all information about what happened is in the hands of the nonmoving party. But here, the only intent evidence is evidence of good faith (McCourt's attempt to preserve the video), and the plaintiff did not pursue discovery about what happened to the hard drives thereafter.

I conclude, therefore, that without evidence of Shaw's' intent to deprive the plaintiff of his ability to use the video in this lawsuit, the plaintiff is not entitled to a jury instruction on inference, mandatory or permissive. If there were a trial, perhaps I would let the jury hear about what happened to the video,[13] but there would be no inference instruction.

---

[13] "[S]ubdivision (e)(2) would not prohibit a court from allowing the parties to present evidence to the jury concerning the loss and likely relevance of information and instructing the jury that it may consider that evidence, along with all the other evidence in the case, in making its decision. These measures, which would not involve instructing a jury it may draw an adverse inference

## MOTION FOR SUMMARY JUDGMENT

On the motion for summary judgment, Maine's substantive law of premises liability applies. In broad terms, a grocery store has a duty to guard its customers against both known dangers and those it should reasonably anticipate, including third-party violence. I will elaborate further on Maine law after I describe, in the light most favorable to the plaintiff, the facts as contained in the record.[14]

The summary judgment record is huge, consisting of documents, depositions, affidavits, health care and police records, photographs and video. The record describes MacCalister's interactions with her family, health care providers, the police, and the community, including affidavits and depositions about her observed conduct on public streets.[15]

Through these materials, the plaintiff presents extensive disturbing evidence of MacCalister's severe mental health issues and bizarre behavior starting in her teenage years. Her history includes severe psychosis, hallucinations, homicidal rage, involuntary commitments, alcohol and drug abuse, multiple drug overdoses, threatening and violent interactions between

---

[14] I refer for the most part, therefore, to the plaintiff's opposing statement of material facts (POSMF) and the plaintiff's additional statement of material facts (PASMF) so long as they are supported by appropriate record citations, D. Me. Loc. R. 56(c), or the defendant's statement of material facts (DSMF) where the plaintiff accepts it or does not properly controvert it, D. Me. Loc. R. 56(f). I have also quoted directly from the depositions or affidavits on occasion. According to Fed. R. Civ. P. 56(c)(3), "[t]he court need consider only the cited materials, but it may consider other materials in the record." When I have done so, I have checked the plaintiff's statements of material facts for any supportable challenges to the materials I have quoted.

[15] The history is laid out in extensive detail in PASMF ¶¶ 1-74 (ECF No. 84). The defendant challenges its admissibility and relevance, but admits the truth of most of it for purposes of the motion for summary judgment.

from loss of information, would be available under subdivision (e)(1) if no greater than necessary to cure prejudice." 2015 Adv. Comm. Note, Fed. R. Civ. P. 37.

MacCalister and other members of the Saco community (even her own family), carrying and brandishing a knife, delusions, periodic catatonia, severe paranoia, and repeated involvement with Saco law enforcement.

The plaintiff argues:

> Plaintiff's Statement of Material Facts provide sufficient evidence from which a reasonable fact finder could conclude that [MacCalister]'s attack on Ms. Boudreau was foreseeable given evidence of anti-social behavior, unusual shopping habits and frightening appearance, loitering, history of scaring customers, previously being banned from the store, management's knowledge of her criminal history and mental health issues, the public and Shaw's employees' general knowledge of her bizarre behavior on North Street and [the] surrounding area, not to mention Shaw's employees' own inferred fear of [MacCalister] given their lack of interaction with her in violation of their own policies.

Pl.'s Opp'n at 20. That statement encompasses a large collection of information, not all of it possessed by or available to Shaw's. There is no evidence that, before the murder, Shaw's had access to MacCalister's medical or police records[16] or family interactions; no evidence that other individuals in the community (including the victim's family members who observed MacCalister's behavior in public spaces and streets outside Shaw's even on the day of the murder) told Shaw's what they observed outside Shaw's;[17] no evidence that Shaw's personnel

---

[16] In 2011, when store director DeRoche called the police about MacCalister (see more detail in text and note 20, infra), a police officer told him that some officers had previous interactions with MacCalister. DeRoche Dep. 64:24-25-65:17 (ECF No. 56-1). But nowhere does the record establish that Shaw's knew any specifics about those interactions. The plaintiff agrees that it "is likely true [that Shaw's was not aware of [MacCalister's] medical, criminal, and psychological history]." Pl.'s Response at 5 (ECF No. 100). But the plaintiff argues that "it is not necessary that Shaw's knew these things in order for the evidence to nonetheless have probative value." Id. However, I focus my attention on what the evidence shows Shaw's knew of the danger from MacCalister or should reasonably have anticipated.

[17] This includes, for example, PASMF ¶ 218, Anderberg Aff. (attached as Ex. D to Melia Aff.) ¶¶ 4-7 (ECF No. 84-17) (referring to strange behavior including MacCalister's pacing up and down the street and an incident in which she "walked right up onto my porch and sat down beside my brother [but] did not speak or make eye contact."); PASMF ¶¶ 161-62; Wright Aff. at 1-2 (ECF

themselves made any of those off-premises observations; and no direct evidence that Shaw's' employees were actually frightened of MacCalister.[18]  I consider only the information that the plaintiff can establish that Shaw's personnel knew or should have known before the murder and reasonable inferences that can be drawn from it.[19]  I state that evidence in the light most favorable to the plaintiff.

### *What Shaw's Personnel Knew*

I turn first to what the record establishes that Shaw's knew.  In 2011, store director DeRoche learned that customers had complained that MacCalister took cigarettes out of the ashtray outside the store entrance, smoked them, and looked scary.  See POSMF ¶ 2; PASMF ¶ 238; DeRoche Dep. at 45:8-46:1.  When DeRoche went to observe her, she had a hoodie "kind of cover[ing] her face," he could see smoke rings coming out from under the hood and it "looked like

---

No. 84-16) (referring to his observations of MacCalister on a bus; I do consider his observations of MacCalister inside Shaw's); the deposition of the murder victim's daughter, Jennifer Boudreau, recounting that her aunt, Patti Parisien, observed MacCalister waving a knife on North Street around lunchtime before the murder, PASMF ¶ 155, Jennifer Boudreau Dep. 27:12-14 (ECF No. 84-12); the deposition of the victim's husband Jeffrey Boudreau recounting his observations of MacCalister on North Street, Jeffrey Boudreau Dep. at 20:13-21:21 (ECF No. 84-12); the deposition of the victim's son, Jason Boudreau, in which he refers to MacCalister's attire during an incident in which she ran out in front of his car, and another occasion when she was waving a knife on North Street, PASMF ¶ 156, Jason Boudreau Dep. at 16-20 (ECF No. 84-13).  An EMT testified that comments in town about MacCalister were that she was "just kind of odd, weird." Armand Beaulieu Dep. at 9 (ECF No. 56-6).  A retired Saco police dispatcher provided an affidavit, PASMF ¶¶ 217-18, saying (among other things) that the police "received a lot of calls from concerned Saco residents complaining about MacCalister's behavior or reporting that she was engaged in suspicious activity" "on an almost daily basis sometimes more than once a day" "behaving strangely while walking down the street, staring into space, pretending to shoot people, or getting right up to car/home windows and staring into them," Steven Boucouvalas Aff. ¶¶ 4-5 (ECF No. 82-2); that "Saco residents constantly told me and others in the department that we needed to get 'that psycho' (or words to that effect) off the streets," id. ¶ 7.  "Within the Saco police and fire departments, it was common knowledge that MacCalister carried a knife (or boxcutter).  She was also rumored to have access to firearms."  Id. ¶ 10.  The record does not show that Shaw's had any of this information I have recounted.

[18] In note 23, infra, I discuss the plaintiff's expert's opinion that Shaw's employees were afraid and the plaintiff's argument that it can be inferred that they were afraid.

[19] Shaw's' lawyer said at oral argument "I think the store is responsible for what the employees inside it know."  I therefore treat all Shaw's' personnel's knowledge as Shaw's' knowledge.

something out of a scary movie." Id. ¶¶ 116, 117, 238, 239. DeRoche called the Saco police, learned that the police had previous unspecified interactions with MacCalister, and banned MacCalister from the store. PASMF ¶ 27.[20] After a year, she was given permission to return. Id. ¶ 241.[21] DeRoche asked loss prevention personnel to watch her, and they did so until 2014. POSMF ¶¶ 16, 28; PASMF ¶¶ 110-11. He did not believe that MacCalister was violent. DeRoche Dep. 84:15-85:15 (ECF No. 56-1). Bryan Goodrich succeeded DeRoche as store

---

[20] The plaintiff's legal memorandum, citing PASMF ¶¶ 238-39, says that the police "specifically put DeRoche on notice that the Saco PD had a history with CM, who was 'crazy,' just like her mother." Pl.'s Opp'n at 8. What those cited paragraphs actually say is that "[t]he police told DeRoche, 'we've had interactions with her before,' and CM lived with her mother who was 'crazier than she is.'" Id. ¶ 238 (citing the affidavit of the plaintiff's expert, Melia). At DeRoche's deposition, the plaintiff's lawyer asked DeRoche if the police "told you we've got a history with her," and he answered, "they didn't say anything specific at all. All they said was, yeah, we're aware of her, we've had interactions with her before." DeRoche Dep. at 64:24 -65:17 (ECF No. 56-1). He also testified: "I do remember them saying, we asked her to leave and we've had interactions with her before. She lives—and they told me the street—with her mother. And it was near the store. She lives there with her mother, and her mother is crazier than she is. That's the entire thing that I can remember from this police officer. And then she was gone. Again[,] he may have said they trespassed her. I don't remember hearing that." Id. at 46:9-18.

[21] In his affidavit, the retired Saco police dispatcher "recall[ed] that MacCalister was banned from Shaw's for a period of time when the manager called and asked someone to serve her with a criminal trespass notice"; after the ban issued, "I took dispatch calls from employees of Shaw's who noted that MacCalister had returned to the premises and they were concerned." Boucouvalas Aff. ¶ 14; PASMF ¶ 221. No dates for these calls were given, but presumably they were during the one-year ban. He also attached, as Exhibit C to his affidavit, "two dispatch calls to Shaw's where the subject's name was not known," saying, "It is possible that one or both of these calls was about MacCalister, based on the physical description (male crew cut, fatigue pants, talking to himself, mental issues). Boucouvalas Aff. Ex. C at 1. In addition, the behavior described on the second page of Exhibit C (smoking and refusing to move for customers) is exactly the kind of thing MacCalister was doing in 2011 when the manager of Shaw's banned her from the store." Id. ¶ 15. That it is "quite possible" that the calls were about MacCalister is not enough to make them admissible as evidence that Shaw's had knowledge of MacCalister's behavior or capacity for violence. Moreover, I note that the first incident, December 31, 2012, involved Customer Service Representative Michelle Schaffer, whose deposition was taken in this case but without reference to the incident. In the dispatch note, it is stated that the person of concern did not threaten anyone, but that Michelle Schaffer was concerned about a child (approximately 7 years old) the person had on a sled. The presence of a child with MacCalister does not square with any other description of her in this record. The second call in March of 2013 refers only to "male at entrance smoking and refusing to move for customers." I realize that MacCalister was generally recognized as transgender, living and identifying as a male before the murder, PASMF ¶ 9 n.2, but that dispatch note of behavior outside a retail store is still far too broad to identify that person as MacCalister.

director in 2014. Def.'s Statement of Material Facts (DSMF) ¶ 32 (ECF No. 56); POSMF ¶ 32; Goodrich Dep. at 19:15-22 (ECF No. 56-9). He heard no complaints about MacCalister before the murder. DSMF ¶¶ 33-34; POSMF ¶ 33-34, Goodrich Dep. 35:3-38:5. Adam Veno became the Assistant Store Director about six weeks before the murder. PASMF ¶ 253. He does not remember seeing MacCalister in the store. Id. ¶ 259; Veno Dep. at 34:17-19 (ECF No. 84-18).

MacCalister visited Shaw's virtually daily, sometimes more than once a day. DSMF ¶ 37; POSMF ¶ 37; see also PASMF ¶ 218 (describing how MacCalister would walk by a Saco resident's house on a "daily basis on her way to Shaw's"); Wood Dep. at 16:15-16 (ECF No. 56-4). She wore baggy men's clothing, either black or camouflage, with a chain on one side, and men's military boots. Her head was shaved; her jaw was clenched; she had bulging eyes, an angry-looking face, and offensive Nazi tattoos on the underside of her arms just above her wrists.[22] POSMF ¶¶ 2, 6; PASMF ¶ 219. She spoke little and sometimes not at all, even when spoken to directly. PASMF ¶ 225. She often had a backpack and did not always use a shopping cart or basket. See POSMF ¶¶ 4, 71; PASMF ¶ 145. When she bought anything, she usually purchased a small number of items. POSMF ¶ 7. There were unverified rumors that she sometimes shoplifted. Id.

---

[22] They were a swastika and an SS symbol. Although the store video is blurry, it appears that on the day of the murder, MacCalister wore her sleeves rolled up, which would reveal the tattoos. I therefore assume that Shaw's' personnel could see them. As previously mentioned, there is also evidence that she was observed with a large knife on the public streets and even in a psychiatrist's office, PASMF ¶ 53, but there is no evidence that the knife was ever visible inside Shaw's. See, e.g., Schaffer Dep. at 10:9-12 (ECF No. 56-5).

A customer who saw her once at Shaw's in the year before the murder described her: "She did not have a basket, but was walking up and down the aisles with the same scary/angry look she always had on her face and in her eyes, dressed in military fatigues." PASMF ¶ 161; Thomas Wright Aff. ¶ 8 (using the adjective "same" to describe her appearance on the bus that both MacCalister and the affiant rode[23]) (ECF No. 84-16).

One cashier, Brittani Leigh Wood, testified that she saw MacCalister in Shaw's quite frequently, sometimes more than once a day. Wood Dep. at 16:15-16; see DSMF ¶ 37; POSMF ¶ 37. Wood described MacCalister as a strange dresser, with a shaved head, Wood Dep. at 17, but Wood saw no weapon on MacCalister in Shaw's, id. at 18. She also did not see MacCalister on North Street, id. at 20, as some members of the public did. She testified that after MacCalister had gone through the cashier's line, customers would say "she's a little strange or what's with her, sly remarks," id. at 21:19-20, or "she seems weird," id. at 22:14-15. See also POSMF ¶¶ 38-39.

Customer Service Representative Michelle Schaffer testified that MacCalister sometimes behaved strangely, PASMF ¶ 229; Schaffer Dep. 9:7 (ECF No. 56-5):

> Her eyes would be kind of, like, big from time to time, just look at you. Just look, you know, almost like she was on— not necessarily unaware of her surroundings; but I think she was just—she gave me the impression that she might have

---

[23] The victim's daughter, Jennifer Boudreau, testified that MacCalister had a very angry look on the streets, Jennifer Boudreau Dep. at 20:16-17, and walked "like she was on a mission." Id. Affiant Wright said: "I never saw MacCalister when she did not look angry, scary and hateful." Wright Aff. ¶ 4 (ECF No. 84-16); PASMF ¶ 162. Affiant Wright was in Shaw's on August 19, 2015, but he did not see MacCalister until the murder occurred, and he described her then as "look[ing] the same way she always did." Wright Aff. ¶ 9.

> been on something. And a couple times she would come in shaking. So—
>
> . . .
>
> I just felt awkward sometimes, I guess, around her. But I think it was general consensus, maybe a little bit, if somebody saw the same thing that I saw, that they might have been like, okay, she's—something is up with her. But it's nothing out of the norm with downtown Saco today.

PASMF ¶¶ 228, 230; Schaffer Dep. 9:9-24.[24] Schaffer "had moments where she felt uncomfortable around" MacCalister, PASMF ¶ 228; Schaffer Dep. at 25:10-28:14.[25] Schaffer could not recall speaking with her. Schaffer Dep. at 10:15-19. Others told Schaffer that MacCalister stole, PASMF ¶¶ 233-34, but Schaffer never witnessed it. Schaffer Dep. at 12:7. The plaintiff's lawyer asked Schaffer if there was any conversation with associates, employees or anyone "to the effect that [MacCalister] was known to have frightening or threatening behavior." She responded: "I wouldn't say she had threatening behavior. I think her appearance to some people probably felt threatened just by her—the way that she—her demeanor or the way that she carried herself or the way that she clothed herself. But as for threatening behavior towards any of us, I don't think I have ever witnessed that." Id. at 25:15-21; POSMF ¶ 43. Schaffer had seen MacCalister in Saco outside of Shaw's "a couple times," but never saw her behaving strangely on the street and never saw her with a knife in the store. Id. at 10:3-12. Schaffer never saw MacCalister act in a violent manner. DSMF ¶ 44; POSMF ¶ 44.

---

[24] McCourt testified at his deposition that Schaffer at one time said to him that MacCalister "acted a little weird," and he told her to talk to the store director. McCourt Dep. at 15, 37. There is no testimony in her deposition nor evidence in the record more generally that Schaffer ever did so.

[25] DeRoche testified: "I have heard that maybe some people said they felt uncomfortable with her in the store. That was—I didn't hear that at the time [2011]. No one ever said a word to me about feeling uncomfortable with her in the store or being afraid of her. No one said that to me, and no one reported it to me either." DeRoche Dep. at 69:17-24.

Customer Deb Surran testified about an incident in June or July of 2015, several weeks before the murder. PASMF ¶ 118-28; Surran Aff. ¶¶ 3, 8 (ECF No. 84-8). Surran reported that she kept seeing MacCalister at the end of each aisle as she shopped, and that MacCalister had no grocery cart. Surran Dep. at 28:18-24 (ECF No. 56-14). Surran believed that MacCalister was following her, "as though she was stalking me." Surran Aff. ¶ 4. When Surran went to the cashier to check out, MacCalister was behind her. Because she was afraid, Surran put her shopping cart between herself and MacCalister and, after checking out, waited behind the cashier until MacCalister checked out and left the store. Id. ¶¶ 4-7; Lavoie Dep. II at 12:17-25 (ECF No. 56-8). Surran spoke to the cashier, Michelle Lavoie, about MacCalister. At her deposition, Surran stated: "I said to Michelle, there is something wrong with that woman. There is something wrong with her. And Michelle replied to me, oh, no. There's nothing wrong with her. She comes into the store every[]day. And I repeated myself, Michelle, there's something wrong with her." Surran Dep. at 53:1-6. The lawyer then asked: "Did you say anything else to Michelle about Connor?" Surran responded: "No. That was it." Id. at 53:7-9. Later, the lawyer asked: "Did you tell her I feel really scared, I really need to do something about this?" Surran answered: "No, I did not." Id. at 54:1-3. But when Surran was confronted with her earlier affidavit's assertion that she whispered to the cashier that MacCalister scared her, she responded, "It's basically the same thing, yeah." Id. at 55:6-12 (referring to Surran Aff. ¶ 7 (ECF No. 84-8)); see POSMF ¶ 81. The cashier testified that Surran's comments "didn't set off the alarm bells in me" and that she "didn't pick up on any distress." Lavoie Dep. I at 30:24, 32:16-17

(ECF No. 56-3); see also Lavoie Dep. II at 19. The plaintiff's legal memorandum argues that Surran was scared, but does not argue that Surran *told* Lavoie that she was scared, only that she told the cashier there was "something wrong." Pl.'s Opp'n at 9. But the plaintiff's opposing statement of material facts asserts that Surran *did* tell the cashier she was scared. POSMF ¶ 81. I do not know what to make of Surran's statement that her affidavit version and her deposition testimony of what she said to cashier Lavoie are "basically the same thing." Surran Dep. at 55:6-12. Treating any ambiguity in the light most favorable to the plaintiff, however, I assume that Surran did whisper to cashier Lavoie that MacCalister scared her. But there is no evidence that she mentioned MacCalister's "stalking" behavior.

Cashier Joan Doyle saw MacCalister approximately four times in Shaw's. Doyle Dep. at 18 (ECF No. 56-2). According to Doyle, MacCalister wore camouflage and, unlike other customers, made no response to Doyle when Doyle spoke. PASMF ¶ 225; Doyle Dep. at 19. A few hours before the murder, MacCalister shopped in Shaw's[26] and purchased a gallon of milk and a few other things. POSMF ¶ 45; Doyle Dep. at 32. Doyle was the cashier who rang up her items. PASMF ¶ 225. Doyle said that when she handed MacCalister her receipt, MacCalister gave her a little smirk or half-smile. POSMF ¶ 47; Doyle Dep. at 34.

---

[26] The plaintiff's additional statement of material facts asserts that a video clip of this earlier visit shows MacCalister "reaching into her pocket and pulling out an object appears to be shaped like a knife." PASMF ¶ 154. But the plaintiff then immediately asserts that "it cannot be determined with any certainty or accuracy whether this was a knife." Id. ¶ 155. There is no evidence that anyone at Shaw's saw MacCalister reaching into her pocket and pulling something out. I therefore do not consider the incident. The plaintiff adds that a Boudreau relative saw MacCalister running down North Street waving a knife the day of the murder. Id. But there is no evidence that any Shaw's employee was aware of that incident before the murder.

Doyle "didn't think too much of it at the time," Doyle Dep. at 35, but recalled it after the murder, PASMF ¶ 47. To Doyle, a "smirk usually means they've got something on their mind," Doyle Dep. at 34, and Doyle did not think there was anything unusual about the transaction beyond the smirking. PASMF ¶ 47. After the murder, Doyle heard rumors that MacCalister shoplifted. Doyle Dep. at 20; <u>see also</u> PASMF ¶ 251.

Some Shaw's employees reported comments made about MacCalister after the murder—that, for example, she engaged in "shoplifting and that she was kind of creepy," PASMF ¶ 251 (shoplifting rumors or suspicions reported by Schaffer, Doyle, Gogos, and McCourt); <u>id</u>. ¶ 160; Gogos Dep. at 23 (ECF No. 84-15) (after the murder other employees said she was "kind of creepy"). Assistant Store Director Adam Veno testified that after the murder he heard that "she was rumored to steal." Veno Dep. at 44. But no items were ever observed to have been taken. <u>See, e.g</u>., Gogos Dep. at 23; DeRoche Dep. at 86; PASMF ¶ 234.

Those are the things the record shows that Shaw's' personnel actually observed or were told about MacCalister, her appearance, and her behavior.

### *What Shaw's Should Reasonably Have Known and Anticipated*

As I said earlier, there is no basis to conclude that Shaw's could have or should have obtained MacCalister's medical records or her police records or information about her interaction with her own family or with the Saco community. I therefore set that evidence and information aside in assessing what Shaw's should reasonably have known and anticipated.

Customer Katie Corriveau testified at deposition that she had seen MacCalister about three times on North Street, but only once in Shaw's, and that

this observation occurred "within ten [days] to two weeks before Wendy was killed." PASMF ¶ 142; Corriveau Dep. at 19-23 (ECF No. 56-15). Corriveau said that about 10-14 days before the murder, she made eye contact with MacCalister in the parking lot outside the store, and thereafter MacCalister followed her into the store with an angry look and a set jaw, and followed her across 2 or 3 aisles. PASMF ¶¶ 146, 148-51. That conduct made Corriveau fearful. Id. ¶¶ 144-45. But Corriveau did not report the incident to anyone at Shaw's before the murder, or see any reason to report it, DSMF ¶ 111; POSMF ¶ 111; Corriveau Dep. at 32:12-14; 50:6-51:21. There is no evidence that Shaw's' personnel observed the incident.

Customer Cindy Belanger testified that she was standing in a cashier's line at Shaw's about a week before the murder and staring at a person whom she identified after the murder (partly from her clothing) as MacCalister. POSMF ¶¶ 129-30, PASMF ¶ 140. As Belanger described it, the individual was standing with a "thuggish" group of people across the store. See POSMF ¶ 118.[27] Belanger testified that the individual, apparently upon becoming aware that she was being stared at, turned around, POSMF ¶ 120; Belanger Dep. at 27:6-24 (ECF No. 56-16), and "lunged" while uttering the word "rah," id. ¶ 119, but that her feet did not move in the "lunge," Dep. at 28: 9-13. Belanger interpreted the

---

[27] The plaintiff's additional statement of material facts says that Belanger also said that the group had been "hanging at Shaw's for several weeks, so Shaw's must have been aware of the potential for trouble," PASMF ¶ 130 (quoting Belanger Dep. at 7 (ECF No. 56-16)). In fact, that appears to be the plaintiff's lawyer reading from a newspaper comment that Belanger wrote in the Portland Press Herald, see id. at 6. The lawyer asked if she read it correctly and Belanger responded "yeah," id. at 7:6. There was no further explanation of the "potential for trouble." If Belanger's earlier out-of-court statement is even admissible on this record, it seems to refer to the *group's* potential for causing trouble, which is not the subject of this lawsuit.

incident as a threat.    POSMF ¶ 119;  Belanger Dep. at 37:23-24.    Upon

questioning by the plaintiff's lawyer, the following interchange took place:

> **Q.** Was the volume of her voice when she did that, was it
> raised?
> **A.** I couldn't hear it that good.  I knew what she was doing
> and what she was saying, but it was—she was too far
> away.  It was like—you know, I was at one side of the store.
> She was clear at the other side of the store, with several
> registers in between, you know, so—
> **Q.** And would you say that there were a number of employees
> of Shaw's between where she was when she made that noise
> and gesture at you and where you were standing?
> **A.** Yeah.  I know other people saw it.
> **Q.** And how do you know that?
> **A.** Their body reaction.  But I don't remember who they were
> or, you know, what the circumstances were.
> **Q.** Do you remember seeing an employee of the store react to
> that gesture?
> **A.** No.

Belanger Dep. at 37:25-38:19; PASMF ¶ 138.  The plaintiff focuses on Belanger's

fear.   See PASMF ¶¶ 129-41.   But Belanger did not report the incident to a

cashier, Belanger Dep. at 9:25-10:1, 15:22-24, or anyone else at Shaw's, DSMF

¶ 125; POSMF ¶ 125; Belanger Dep. at 29-30.   Belanger's account—that she

knows other people saw the incident because of "[t]heir body reaction" but does

not remember a store employee reacting to the gesture—does not show that any

Shaw's employee saw the threat.[28]

---

[28] The plaintiff's retail security and loss prevention expert Stephen Melia concluded that some of
the store's cashiers could likely see MacCalister in this incident, Melia Aff. ¶¶ 132-33, but he
never visited the store to examine the lines of sight, Melia Dep. at 132:1-2 (ECF No. 56-17).
PASMF ¶¶ 284-85.  The defendant's security expert, Jonathan Groussman, did visit the store
and looked at sight lines.  See POSMF ¶ 134; Groussman Dep. at 197:10-199:19.  He testified
that cashiers could not see MacCalister if she were in the produce section, Groussman Dep. at
196:7-14, but it is not clear that he placed MacCalister in the location Belanger described.
POSMF ¶ 134.  (Belanger testified that MacCalister was standing "near" the produce section.)
Neither party provided photographs or diagrams of the front end of the store.  But the plaintiff
agrees that Melia "admitted that he did not know whether the cashiers working the checkout
lines would have been able to see the interaction between Ms. MacCalister and Ms. Belanger,"
DSMF ¶ 152; POSMF ¶ 152; Melia Dep. at 45:10-14.

Thus, there is no evidence that Shaw's knew of the Corriveau or Belanger incidents. The plaintiff seems to argue that Shaw's personnel should have observed those incidents, but the record does not support that conclusion[29] or the necessary next step that Shaw's then should reasonably have anticipated that MacCalister was a danger to other customers.

A post-murder review of the store's video shows that after her earlier purchase at Doyle's station on the day of the murder, MacCalister exited the store and sat for about five minutes on the ground very close to the door, almost on the automatic door sensor. PASMF ¶¶ 211-13; Melia Aff. ¶¶ 51, 52 (ECF No. 84-17). This occurred about three hours before the murder. PASMF ¶ 211; Melia Aff. ¶¶ 51, 52. There is no evidence that any Shaw's personnel observed that conduct.

Just before the murder, two EMTs who were shopping at Shaw's observed MacCalister in the store. See PASMF ¶¶ 187-88. They recognized her from previous encounters (not in Shaw's). Id. One testified that at the time, MacCalister was not behaving differently from other shoppers. POSMF ¶ 56; Armand Beaulieu Dep. at 28 (ECF No. 56-6). The other had written an earlier witness statement that the plaintiff's lawyer obtained from the State Attorney General's office in its murder investigation. Pl.'s Mot. to Seal ¶ 6 (ECF No. 82). In that written statement he had said:

---

[29] According to the plaintiff, the "customer encounters are highly relevant because they serve as circumstantial evidence allowing a jury to infer that Shaw's likely saw the same things." Pl.'s Resp. at 4 (ECF No. 100). But I have no basis beyond supposition and speculation to conclude that any Shaw's' employee did see MacCalister's interactions with Belanger and Corriveau. The plaintiff had full opportunity through investigation and deposition to gather evidence of what Shaw's' employees saw or didn't see.

> On walking over to the meat section is when I first saw the assailant as she was walking towards me coming from the frozen foods section. She caught my attention as her demeanor and presentation was different, I noted her walking by me several times (as if she was pacing) while I was in the back of the store, she didn't have a basket or pushing a cart and wasn't carrying any groceries but as I thought maybe she hasn't found what she [was] looking for yet, Armand [the other EMT] then met up with me and mentioned he had noticed this same person walking back and [forth] and mentioned that the fire department had a past with this person. We then brushed it off . . . .

Statement of Jerry Beaulieu at 148 (ECF 82-3). See also POSMF ¶¶ 53, 56, 58, 59; PASMF ¶ 187. The plaintiff's lawyer later questioned him about his statement[30]:

> Can you describe to me, as she's walking toward you, what you observed[?]
> **A.** She was walking in the back part of the store. It was a pretty good pace, like she was on her way to get something. What struck me is she was dressed in full army fatigues, which kind of was like, okay. But I knew, well, that's Connor.
>    So then it was just like as soon as I made a connection who that was, it was like, all right, I just know who she is. She's—she likes to be different and that's who she is. So that—no problem with that.
> **Q.** Meaning you had seen her dressed like that before; is that—
> **A.** She would—she would—I hate to use the word stick out, but she would like wearing full army fatigues, something like that. Or all dressed in leather, that kind of thing.
>    So, you know, when you see her, you knew it was her. You know, okay, it's Connor.
> . . .
> **Q.** What did her face look like at the time?
> **A.** Normal. Just—she was wearing sunglasses. She had her ear pods in. She was listening to music, just walking down the aisle.
> . . .
> **Q.** What do you mean by pacing?
> **A.** She was just walking the back row, like she was looking for something. It's almost like she couldn't find the aisle that the food was in type thing, so she kept going back and forth.

---

[30] The admissibility of the earlier written statement is uncertain. I will assume it is admissible under Fed. R. Evid. 803(5), although it is not clear that the witness "now cannot recall well enough to testify fully and accurately." Id.

So it just—you know, I just noticed her walk by me several times. You see people—a lot of people don't recognize the stuff from the store, but we tend to be on high alert, so we notice people and their actions more so than people driving, people in the store, people—and that's just one of those things that caught my eye.

**Q.** It certainly stood out more to you than any other customer—

**A.** Right[.]

**Q.** —that was around you at that moment, right?

**A.** Yeah.

**Q.** And did you find it odd that she was pacing, but not—didn't appear to be carrying a basket or a shopping cart?

**A.** It caught my eye, but I didn't think anything of it. It didn't really—you know, I didn't think anything threatening or anything like that. It was just . . .

**Q.** Okay. When you say her demeanor was different, what did you mean by that when you wrote that in your statement?

**A.** It was just the way she was walking. Like say she was in a hurry. She was kind of walking fast.

**Q.** Some people in this case have described that she tended to present as being angry. Would you agree with that?

**A.** I didn't get that. It was more just like she was in a hurry, looking for something. That's the best I can describe it.

Jerry Beaulieu Dep. at 13:4-16:8 (ECF No. 56-7).

Although the plaintiff's expert says that Shaw's employees should have observed this behavior by MacCalister in the minutes immediately before the murder and intervened,[31] PASMF ¶ 188; Melia Aff. ¶ 27, the EMT's observations

---

[31] The plaintiff's expert believes that the video shows "[w]hat appears to be an employee of the meat department, in a classic white coat/uniform," Melia Aff. ¶ 29, in proximity to MacCalister. The expert refers to him thereafter as "[t]he presumed Shaw's meat department employee," id. at ¶ 31, and concludes that this presumed employee should have made the same observations as the EMTs and taken action. Shaw's denies that the figure in a white coat was an employee, points out that he appears to be wearing shorts and sandals, and asserts that it has a meat department dress code that is inconsistent with this apparel. Goodrich Aff. ¶ 18 (ECF No. 96-1). The plaintiff's expert also perceives in the video a later crossing of paths between MacCalister and an employee carrying a broom. Aff. ¶¶ 34-35. These observations are summarized in PASMF ¶¶ 188-96. The expert states: "Based on the . . . testimony of [the EMTs] and the details I can see from the photos at Exhibit B, my expert opinion is that the employees working for Shaw's had the same opportunity to take notice of [MacCalister] pacing in the back of the store. . . . Shaw's should have noticed this and approached or interacted with [MacCalister]; if the EMTs had enough time to notice her, then the store's own employees should have as well." Aff. ¶ 27. Although I am doubtful that the plaintiff's expert is competent to identify these as Shaw's' employees, I will assume for summary judgment purposes that they are Shaw's' personnel.

of pacing and the contemporaneous video clips do not support an inference that Shaw's was then put on notice that MacCalister posed a danger to another customer, given the information Shaw's had about MacCalister's previous behavior in the store and the lack of information Shaw's had about her behavior in Saco outside of Shaw's.

### *Combination of What Shaw's Knew or Should Reasonably Have Known and Anticipated*

In sum, the record viewed most favorably to the plaintiff shows that in 2011 store director DeRoche learned that MacCalister scared customers by her appearance and her conduct in smoking cigarette butts outside the store entrance. DeRoche confirmed for himself that she looked scary, and called the Saco police. They told him that MacCalister had unidentified previous interactions with the Saco police and characterized her and her mother as "crazy." She was then banned from the premises. After a year (*i.e.*, in 2012), she was permitted to resume shopping at Shaw's and there were no other incidents until the events of 2015. MacCalister had a shaved head, wore baggy black or camouflage clothing with a chain, men's military boots, and a backpack, and had offensive Nazi tattoos. She shopped regularly at Shaw's, buying small quantities of goods, and often did not use a shopping cart or basket. MacCalister was suspected of shoplifting but was never caught doing so. Shaw's' policies warn employees that people engaged in shoplifting can be violent, but this murder had nothing to do with shoplifting. MacCalister had an angry face, bulging eyes, and clenched jaw, looked creepy, exhibited taciturn behavior, was seen shaking a couple of times, and sometimes appeared as if she were "on"

something.  Customers told cashiers words to the effect that something was wrong with her or that she was strange or weird.  One customer service representative sometimes felt awkward or uncomfortable in her presence but did not witness threatening behavior.[32]  In June or July, customer Surran told cashier Lavoie that she was frightened of MacCalister and that there was something wrong with her.  On the day of the murder, when MacCalister bought a few items about three hours earlier, she gave cashier Doyle a smirk or half-smile when Doyle handed her the receipt.

But MacCalister was never physically violent on store premises before the murder and she never displayed knives in Shaw's.  Shaw's was unaware of MacCalister's behavior in the Saco community.  However one interprets the significance of MacCalister's pacing just before the murder, and assuming that Shaw's personnel saw or should have seen it, there is no basis to conclude that it put Shaw's on notice that MacCalister was dangerous.  Her smirk or half-smile to cashier Doyle at checkout a few hours earlier is likewise not enough for a jury to conclude that it was a signal of impending violence and that Shaw's should then have done something.  Even the plaintiff's expert concedes that it was not significant.  Melia Dep. at 33:5.

I apply Maine law to those facts.

---

[32] The plaintiff asserts at page 10 of her legal memorandum that the staff at Shaw's were afraid of MacCalister and at page 20 refers to "Shaw's employees' own inferred fear of" MacCalister.  See PASMF ¶ 290; see also Melia Aff. ¶ 138 ("The staff was frightened of CM too.").  Melia, the plaintiff's expert, has no foundation to testify about employees' fear or lack thereof.  Moreover, no Shaw's employee testified that he or she was afraid of MacCalister.  The most any employee said was that she felt awkward or uncomfortable with MacCalister.  Schaffer Dep. at 28:11 (ECF No. 56-5).  For summary judgment purposes, I do not accept the plaintiff's characterization of the employees' "inferred fear," for lack of evidence.

*Maine Law*

The first issue in a negligence case is whether the defendant owed the plaintiff a duty of care.  The Maine Law Court's most recent pronouncement on the question of duty[33] in a premises liability negligence case involved a sexual assault at a fraternity house.  In <u>Brown v. Delta Tau Delta</u>, 118 A.3d 789 (2015), the Law Court stated:

> Even though the issue is fact driven, the question of duty is a legal question decided by the court, not the jury.  Because it is a mixed question of law and fact, the facts in any given case will determine whether an entity has a duty to the putative plaintiff.  This is a multi-factored analysis that necessarily evokes policy-based considerations including the just allocation of loss.

<u>Id</u>. at 791-92 (internal citations omitted).  For these "policy-based considerations including the just allocation of loss," the Court previously had said:

> We must always consider societal expectations regarding behavior and individual responsibility in allocating risks and costs, and we consider "'the hand of history, our ideals of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall.'"

<u>Alexander v. Mitchell</u>, 930 A.2d 1016,1020 (Me. 2007) (not a premises liability case); <u>Decker v. New England Pub. Warehouse</u>, 749 A.2d 762, 765 (Me. 2000) (same); <u>Trusiani v. Cumberland & York Distributors, Inc.</u>, 538 A.2d 258, 261 (Me. 1988) (same, and adding "mores of the community" and the "endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind").

---

[33] For a helpful discussion of Maine's duty cases, see Simmons, Zillman & Furbish, Maine Tort Law § 7.03 (2018).

In dealing with a third-party assault at a retail store, the Law Court has made the parameters of duty clear: "a proprietor of an inn, hotel, motel, restaurant, or similar establishment is liable for an assault upon a guest or patron by another guest, patron, or third person *where he has reason to anticipate such assault, and fails to exercise reasonable care under the circumstances to prevent the assault or interfere with its execution.*" <u>Kaechele v. Kenyon Oil Co.</u>, 747 A.2d 167, 170 (Me. 2000) (emphasis added) (quoting <u>Brewer v. Roosevelt Motor Lodge</u>, 295 A.26 647, 651 (Me. 1972)). "A proprietor must guard its patrons against *not only known dangers but also those which it 'should reasonably anticipate.'*" <u>Id</u>. at 171 (emphasis added) (quoting <u>Brewer</u>, 295 A.2d at 651). The reasonable anticipation issue "must be analyzed from two perspectives: first, did [the store] have notice that its facility generally presented a risk that third parties would assault its patrons; and second, did [the store] know, or should it have anticipated that [the person who committed the violence] would assault a patron on the [afternoon] in question." <u>Id</u>. In this case, the plaintiff does not argue the first "perspective" (that Shaw's had notice of a general Saco facility risk of third-party assault), but only the second—that on or before August 19, 2015, Shaw's should reasonably have anticipated that MacCalister was a danger to other customers.[34] So the issue here is *foreseeability* (reasonable

_____

[34] Although the plaintiff's legal memorandum makes brief reference to the Saco urban environment, Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Opp'n) at 20 (ECF No. 85), at oral argument the plaintiff confirmed that the estate's claim does not rely upon either the urban environment in Saco, Maine, or experiences at other Shaw's stores, but rather upon the Saco Shaw's store's experience with MacCalister.

I use the broad term "danger to other customers" because the Law Court has said: "That defendant's employee could not have foreseen the exact nature of the injury which in fact occurred, does not relieve him of liability, if some harm was reasonably foreseeable under the

anticipation).  Given Maine's clear law on this issue, I conclude in considering Shaw's duty that I do not need to assess—with one possible caveat—the policy-based considerations of duty, but only foreseeability.

The Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 cmt. *j* (2010), "disapproves" of this practice of making foreseeability a part of the "duty" determination:

> A no-duty ruling represents a determination, a purely legal question, that no liability should be imposed on actors in a category of cases.  Such a ruling should be explained and justified based on articulated policies or principles that justify exempting these actors from liability or modifying the ordinary duty of reasonable care.  These reasons of policy and principle do not depend on the foreseeability of harm based on the specific facts of a case.  They should be articulated directly without obscuring references to foreseeability.
>
> . . . A lack of foreseeable risk in a specific case may be a basis for a no-breach determination, but such a ruling is not a no-duty determination.  Rather, it is a determination that no reasonable person could find that the defendant has breached the duty of reasonable care.[35]

Maine recognized the difficulty in 1992: "The designation of harm as 'foreseeable' gives rise to some confusion in negligence analyses because the question of foreseeability informs both the issue of duty and the issue of

---

circumstances" and that the question of whether the ultimate harm was within the range of reasonable apprehension of "some harm" is for the jury.  Schultz v. Gould Academy, 332 A.2d 368, 370 (Me. 1975).  "[D]anger to its customers" is also a term that the plaintiff uses.  See Pl.'s Opp'n at 21.

[35] The Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40(b)(3) (2012) now covers the affirmative duties of those who hold their property open to the public, replacing the Restatement (Second) of Torts § 344.  See Restatement (Third) of Torts § 51 cmt. *a*.  Section 40(b)(3) cmt. *d* says:

> When a court is persuaded that, under the particular circumstances involved in the case, no reasonable jury could conclude that the defendant acted unreasonably, the court should find the evidence of negligence insufficient as a matter of law.  Such a resolution is preferable to employing a no-duty rule that is based on the particular facts of the case.  See § 7, Comment *j*."

Section 7, comment *j*, is the comment I have quoted in text.

proximate cause." Cameron v. Pepin, 610 A.2d 279, 281 (Me. 1992). Nevertheless, that case declared that "[f]oreseeability . . . is one consideration among many that must be taken into account when courts engage in a duty analysis," id. at 282, and the Law Court has never departed from that formulation. I apply Maine law and terminology and therefore speak in terms of the court's role in determining duty, including the role of foreseeability or reasonable anticipation, but I do so, taking the facts in the light most favorable to the plaintiff.[36]

It is tempting to say that there is a material factual issue on foreseeability, and simply leave this tragic case to a jury to straighten out. But Maine law is clear—Shaw's is liable only if it reasonably should have anticipated that MacCalister was a danger to another customer on August 19, 2015. MacCalister's appearance and behavior in Shaw's scared some customers and sometimes made a customer service representative feel awkward or uncomfortable, and her clothing and shopping behavior made her a suspect for shoplifting. Viewing this record in the light most favorable to the plaintiff, I conclude that what Shaw's knew, should have known, or should reasonably have anticipated did not suggest that on August 19, 2015, MacCalister was a danger to other customers.[37]

---

[36] My ruling would be the same with the Third Restatement's different nomenclature. Specifically, Maine's law of premises liability duty is clear, but the evidence presented on the motion for summary judgment viewed in the light most favorable to the plaintiff would not support a jury finding that Shaw's should reasonably have anticipated that MacCalister created a danger to its customers and taken preventive action on or before August 19, 2015.

[37] The plaintiff has presented an expert's opinion that Shaw's shoplifting prevention policies were violated and, if followed, could have forestalled the murder. PAMSF ¶¶ 75-94. If I had found a duty on the part of Shaw's because it reasonably should have anticipated danger from

And there is a potential policy issue here. Because the record does not establish reasonable anticipation of danger, I need not resolve it, but the lurking issue is what should be the duty of public retailers whose customers have bizarre or offensive clothing, appearance, demeanor or behavior but do not actually engage in or threaten violence on the retailers' premises? To avoid risk, should the retailers exclude them from their stores?[38] If the plaintiff should appeal and if the First Circuit should disagree with my conclusion about the foreseeability of MacCalister's danger to other customers, it might be advisable to certify the issue to the Maine Law Court, because the state public policy issue cannot easily be resolved by a federal court.

---

MacCalister, such evidence might be relevant on proximate causation and on whether Shaw's behaved reasonably in light of the threat. But I do not reach those issues because I conclude that in light of what Shaw's knew or reasonably should have anticipated, it had no reason to anticipate that MacCalister was dangerous to other customers and therefore no duty.

The plaintiff also seems to argue that as a suspected shoplifter MacCalister should have been viewed as a threat of violence. Pl.'s Opp'n at 6, 12; see also PASMF ¶ 251 referring to the plaintiff's expert's affidavit that because a shoplifter is already committing a crime, the "likelihood that they would commit another crime may therefore be increased" and referring to Shaw's' training materials that staff should be "aware of the increased propensity for violence when dealing with shoplifters." Melia Aff. ¶ 99. But the plaintiff has admitted that his expert "agreed that certain criteria—like a person wearing baggy clothing, carrying a backpack, shopping with a bag that is open, putting things in a shopping cart so one cannot see what is underneath, or getting to the door and not quite looking like one is going to buy something—are triggers for shoplifting but are not criteria that in and of themselves would predict whether someone might commit a violent crime." DSMF ¶ 159; POSMF ¶ 159. Here, MacCalister's murder of Boudreau had nothing to do with shoplifting. Yes, treating MacCalister as a shoplifter and keeping her out of the store or intervening on the day of the murder might have prevented the murder, but so too would keeping her out of the store for discriminatory reasons involving her medical condition, gender identity, personal style choices, etc. Boudreau's murder was not within the scope of risk that Shaw's shoplifting policies were concerned with.

[38] Shaw's raised this important issue summarily in the concluding paragraph of its reply: "At a policy level, the Plaintiff's position is untenable, as it would make grocery stores, retailers, restaurants, and all public places responsible for identifying the psychiatric and criminal histories of all individuals who pass through their doors, or at least those who appear different. The Plaintiff would charge stores with the responsibility to constantly monitor these individuals while they are on the premises." Def.'s Reply to Pl.'s Opp'n at 10 (ECF No. 95). Because the issue was first raised in the defendant's reply, the plaintiff did not have an opportunity to respond to the argument in writing. The plaintiff did not address it at oral argument.

**CONCLUSION**

Wendy Boudreau's August 2015 murder in the Saco Shaw's ice cream aisle was a shocking, tragic event.  Could or should police and health care personnel, with the information available to them, have appreciated MacCalister's danger to others and taken steps to thwart it?  I don't know.  But the summary judgment record does not support the conclusion that either generally or on the day in question Shaw's' personnel knew or reasonably should have anticipated that MacCalister posed a danger to other customers in its Saco store.

The plaintiff's motion for sanctions is **DENIED** and the defendant's motion for summary judgment is **GRANTED.**[39]

**SO ORDERED.**

**DATED THIS 18TH DAY OF JULY, 2019**

/s/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[39] To the extent that either party has asked me to strike statements of material facts, no action is necessary in light of my ruling.